IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-01797-MSK-KLM
(Consolidated with Civil Actions No. 06-cv-1922-MSK-KLM  and Civil Action No.
06-cv-02017-MSK-KLM)

LEON BRITTON, Derivatively on behalf of Delta Petroleum Corporation,

        Plaintiff,

v.

ROGER A. PARKER,
ALERON H. LARSON, JR.,
KEVIN K. NANKE,
JOHN R. WALLACE,
JERRIE F. ECKELBERGER,
JAMES B. WALLACE,
RUSSELL S. LEWIS,
JORDAN R. SMITH,
NEAL A. STANLEY,
KEVIN R. COLLINS,
JAMES P. VAN BLARCOM,
TERRY D. ENRIGHT, and
JOHN P. KELLER,

        Defendants,

and

DELTA PETROLEUM CORPORATION, a Delaware corporation,

        Nominal Defendant.

_____

**OPINION AND ORDER GRANTING MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion to Dismiss (**# 112**), the Plaintiff's response (**# 116**), and the Defendants' reply (**# 119**).[1]

## FACTS

The relevant facts, derived from the Second Amended Complaint[2] (**# 115**), are summarized here and discussed in greater detail as necessary in the analysis below. The Defendants are Directors and Officers of Nominal Defendant Delta Petroleum Co. ("Delta"). Beginning in 1993, Delta occasionally promulgated Stock Incentive Plans for its Directors and Officers, allowing the company to issue options to those individuals to purchase Delta's stock at a specified share price (the "strike price"). The terms of the Incentive Plans required that the share price specified in the options be equal to or greater than the current market price for Delta's stock as of the date the option was granted.

The Plaintiff alleges that on eight occasions between 1996 and 2003,[3] the Directors and Officers knowingly backdated or otherwise manipulated stock options granted under the Incentive Plans to ensure that the strike price of those options was less than the actual share price of Delta's stock at the time, thereby making the exercise of the option immediately profitable for

---

[1]The parties have also filed or responded to various notices of supplemental authority (**# 123, 126, 127, 129**).

[2]The Plaintiff refers to this document as the "First Amended Consolidated Complaint," but because it is the third iteration of the Plaintiff's pleading in this action, the Court refers to it as the Second Amended Complaint.

[3]The Second Amended Complaint is not always consistent. It sometimes references backdating occurring between 1996 and 2005, and sometimes makes reference to suspicions about 9 of 23 options granted during the relevant period, but the charts specifically listing "alleged backdated stock option grants" list only 8 grants between 1996 and 2003. *Docket* # 115 at 10-11, 14-15. Some of these inconsistencies may be vestiges of previously-asserted but since-abandoned theories of liability not fully eradicated from subsequent pleadings.

the Director or Officer receiving it (a condition referred to as the option being "in the money").

The Plaintiff, a Delta shareholder since January 2004, analyzed the eight specified option grants

according to a methodology explained in a 2006 study of options pricing by Merrill Lynch ("the

Merrill Lynch methodology").  The methodology purports to examine the return on investment

realized by the individual exercising the stock option, compared to the return that a public

investor would have realized from a similar investment in company stock over a certain time

period.  The disparity between those returns, according to the Plaintiff, warrants an inference that

the options issued by Delta were backdated.  In addition, the Plaintiff contends that delays by

Delta in its SEC reporting regarding the granting of the options suggest the potential of

backdating, as does the fact that the options were granted sporadically and discretionarily, rather

than according to a fixed schedule or formula.

The Plaintiff contends that the practice of backdating or otherwise manipulating the

options is material information that should have been disclosed to stockholders.  Among other

things, where backdating results in options being "in the money," the option holder is able to

realize an immediate profit from the benefit of the option.  Thus, rather than providing incentives

to Directors and Officers to continue to work to increase Delta's stock price, "in the money"

options amount to certain and immediate compensation for the grantee.  Because Delta is

required to report the amount of compensation actually paid to its Directors and Officers, and

because its profitability is affected by such payments, the failure to report the backdated options

constitutes a material misrepresentation or omission by Delta on its balance sheets as well.

The Plaintiff's primary claim in the Second Amended Complaint relates to Delta's failure

to disclose the backdating practice in Proxy Statements, issued to shareholders in conjunction

with Delta's annual meetings, through which Incentive Plans were submitted for shareholder approval and Directors were elected.  The Plaintiff contends that each of Delta's Proxy Statements from 1997 to 2005 failed to disclose the backdating of the options, and indeed, falsely represented to shareholders that the options being issued to Directors and Officers were properly priced according to the stock price as of the date the option was granted.

The Plaintiff, suing in a stockholder derivative capacity on behalf of Delta, asserts five claims for relief against each of the Defendants: (i) a state-law[4] claim for breach of fiduciary duty; (ii) a state-law claim for unjust enrichment; (iii) a state-law claim for corporate waste; (iv) a state-law claim for "gross mismanagement"; (v) a state-law claim for an accounting; and (vi) a claim that the 1997-2005 Proxy Statements omitted material information regarding the Defendants' backdating scheme, in violation of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a).

The Defendants move (**# 112**) to dismiss the Second Amended Complaint, arguing: (i) because the Plaintiff did not purchase Delta stock until January 2004, he lacks standing to complain of any actions occurring prior to that date, leaving only the §14(a) claim relating to the 2004 and 2005 Proxy Statements for adjudication; (ii) the § 14(a) claim fails to state a claim for relief in that it fails to show a misrepresentation or omission, as the Plaintiff's only basis for the assertion that the options were indeed backdated are speculative statistical correlations shown by the Merrill Lynch methodology, not actual evidence of backdating; (iii) the § 14(a) claim further fails to allege facts that would demonstrate that misstatements by the Defendants in the Proxy

---

[4]The Second Amended Complaint does not specifically identify which state supplies the substantive law governing any of the state-law claims.

Statements were negligent; (iv) the § 14(a) claim also fails to adequately allege an "essential link" between the 2004 and 2005 Proxy Statements and the alleged backdating scheme, as shareholder votes in 2004 and 2005 were not necessary to approve option grants that had already been made pursuant to previously-approved Incentive Plans; and (v) pursuant to Fed. R. Civ. P. 23.1, the Plaintiff fails to sufficiently demonstrate that he should be relieved of the obligation to make a demand upon Delta's Directors that the corporation pursue the claims before commencing this derivative suit.

## ANALYSIS

### A.  Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall*, 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

Two recent decisions from the Supreme Court have clarified the analysis that the Court undertakes when reviewing a pleading under Rule 12(b)(6) standards.  First, although "detailed factual allegations" are not required, a complaint must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, a complaint must have sufficient factual assertions "to raise a right to relief above the speculative level."  *Id.*  Second, because a court is "not bound to accept as true a legal conclusion couched as a factual allegation," it must first identify and disregard averments that "are no more than conclusions [which] are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  A court then examines the remaining, well-pled factual allegations, assuming their veracity, and determine whether they plausibly give rise to an entitlement to relief.  *Id.*

In considering the Plaintiff's pleadings, the Court is also mindful of the requirements of the Public Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires that certain elements of a securities claim, most notably the nature and content of fraudulent statements and a defendant's state of mind, be pleaded with a degree of particularity above that of ordinary notice pleading.  *See generally Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095-96 (10th Cir. 2003).  With regard to fraudulent statements, the Plaintiff must specifically identify the statement alleged to have been misleading and the reasons why that statement is misleading; with regard to scienter, the Plaintiff must allege facts that "give rise to a strong inference that the defendant acted with the required state of mind."  *Id.*

The Defendants also raise the issue of standing, which is component of subject-matter jurisdiction and analyzed under Fed. R. Civ. P. 12(b)(1).  The party asserting the existence of subject matter jurisdiction– in this case, the Plaintiff– bears the burden of proving such jurisdiction exists, including the burden of demonstrating adequate standing.  *Hydro Resources, Inc. v. E.P.A.,* 563 F.3d 1249, 1258 (10th Cir. 2009); *Montoya v. Chao*, 269 F.3d 952, 955 (10th Cir. 2002).  Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the

sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), *citing Holt v. United States,* 46 F.3d 1000, 1002-03 (10th Cir.1995). Here, the Defendants challenge the facial sufficiency of the Plaintiff's assertion of his standing, and thus, the Court treats the allegations regarding standing in the Second Amended Complaint as true.

**B.  Standing**

The Court first turns to the question of the Plaintiff's standing to bring each of the claims asserted herein.  Standing is assessed on a claim-by-claim basis.  *See Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893 (9th Cir. 2007).  An essential component of standing in a case such as this, where a shareholder purports to derivatively assert claims that belong to the corporation, is that the Plaintiff must have owned stock in the company at the time of the complained-of corporate acts.  *See Rosenbaum v. MacAllister*, 64 F.3d 1439, 1443 n. 2 (10th Cir. 1995).

The Plaintiff alleges in the Second Amended Complaint that he has been a shareholder of Delta since January 26, 2004.  Notably, his ownership post-dates all of the alleged instances of backdated options, the last of which was granted in 2003.  The only conduct described in the Second Amended Complaint that occurred after the Plaintiff obtained shares in Delta is the issuance of the 2004 and 2005 Proxy Statements.  Thus, on the surface, it appears that the Plaintiff lacks standing to bring any claim except the § 14(a) claim premised on misrepresentations or omissions in the 2004 and 2005 Proxy Statements.

The Plaintiff does not squarely and distinctly address the Defendants' argument that he lacks standing to pursue most of the claims in this case.  In his response to the Motion to Dismiss, the Plaintiff addresses the standing issue only briefly and indirectly in the "Introduction and Overview" section.  He notes that the Defendants concede that he has standing to challenge the 2004 and 2005 Proxy Statements via the § 14(a) claim, *Docket* # 119 at 5 n. 4, but appears to agree with a prior Recommendation **(# 108)** by the Magistrate Judge[5] that his "standing [is] properly based on the date when his action 'accrued' – *i.e.* the date on which the false 2004 and 2005 Proxy Statements were issued." *Id.* at 8.  Nowhere in his response brief does the Plaintiff assert that he enjoys standing to challenge anything other than the 2004 and 2005 Proxy Statements.

The Plaintiff makes a passing, unsupported argument invoking the late Mr. Hamberger, a plaintiff in *Hamberger v. Parker*, D.C. Colo. Case No. 06-cv-01922, a similar derivative suit against the Defendants that has been consolidated into this action.[6]  The Plaintiff here argues that

---

[5]The Court ultimately declined **(# 111)** to consider the substantive merits of the Magistrate Judge's Recommendation.

[6]Fed. R. Civ. P. 42 provides that cases having common questions of law and fact may be "consolidated," but does not specify the practical consequences of such a consolidation. Conceivably, "consolidation" might only mean that related cases are jointly administered for pretrial and trial purposes (*e.g.* to create a single Scheduling Order governing all of the cases), but remain separate and distinct suits, each pursued by their own named parties.  On the other extreme, "consolidation" can be understood to mean that all of the joined cases are incorporated into a single ongoing suit, losing their individual character in the process.

Here, it appears to the Court that, in seeking consolidation **(# 11)**, the plaintiffs in each of the member cases assumed that a consolidated action would absorb and extinguish their individual suits in favor of a new "Consolidated Complaint" embodying any claims any of the original plaintiffs wished to assert.  *See e.g. Docket* # 11, ¶ 5(b), (c) (indicating various ways in which a selected "lead counsel" will be able to speak on behalf of all of the plaintiffs).  Thus, the Court understands Mr. Hamberger's action, to the extent not asserted in the Second Amended Complaint (the consolidated pleading contemplated by the plaintiffs), has been voluntarily

Mr. Hamberger, had he survived, would have had adequate standing to pursue the claims here and further argues, without pointing to applicable citation, that "Defendants should not be allowed to benefit from Mr. Hamberger's misfortune." To the extent the Plaintiff here contends that he can somehow "borrow" the late Mr. Hamberger's standing, that argument is without merit.

Neither Mr. Hamberger nor his personal representative is named as Plaintiffs in the Second Amended Complaint. Whether Mr. Hamberger's own suit against the Defendants can be uncoupled from this action and continue on its own is a question that may ultimately require further analysis by the parties. *See e.g. Saylor v. Bastedo*, 623 F.2d 230, 237 (2d Cir. 1980) (discussing issues involved when a shareholder plaintiff in derivative suit dies) & n. 6 *supra*. But it is a question that is immaterial to the Plaintiff's ability to bring the claims here of his own accord. The entire purpose of the doctrine of standing is to ensure that <u>this</u> plaintiff is a suitable party to pursue the claims, not to inquire whether <u>others</u> to whom a plaintiff may claim a kinship possess the requisite interest in the case. *See e.g. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) (standing requires "that the party seeking review be himself among the injured"). Absent a showing that the Plaintiff here – the <u>only</u> Plaintiff listed in the Second Amended Complaint – possesses some standing to assert claims beyond the §14(a) claim based on the 2004 and 2005 Proxy Statements, those claims must be dismissed for lack of standing.

Perhaps recognizing the untenability of his position, the Plaintiff suggests – without actually moving for any specific relief – that the Court should defer any dismissal of claims based on the Plaintiff's lack of standing so as to allow the Plaintiff an opportunity to attempt to

extinguished.

9

recruit a replacement shareholder with sufficient standing to act in his stead.  The Plaintiff

directs this Court's attention to the Magistrate Judge's Recommendation, which noted several

situations in which courts stayed dismissal of a putative derivative suit to allow the substitution

of a more suitable shareholder for a plaintiff who lacked sufficient standing.  Without necessarily

disagreeing with either the Magistrate Judge's analysis of this issue nor her conclusion that, as of

September 2008, leave for the Plaintiff to recruit a substitute was warranted, this Court observes

that any such request for relief by the Plaintiff at this point in time would be untimely.

     The Plaintiff has been on notice of his problematic standing since at least November

2007, when the Defendants squarely raised that issue in opposing (# 81) the Plaintiff's request

for leave to file the Second Amended Complaint.  The Plaintiff himself acknowledged (# 91) as

early as December 2007 that, should his standing be found to be insufficient, he might be able to

remedy that situation by recruiting a better-positioned replacement.  *Id.* at 2-3 ("At the very

least, plaintiff asks this Court for time in which to find and intervene a plaintiff with a longer

holding period").  Despite recognizing the possibility of a dismissal for lack of standing (and the

recognition of a means to prevent that outcome), the Plaintiff has not recruited another Delta

shareholder to better present the claims, and he makes no argument that he is better situated to do

so now.[7]

     Nearly a year has passed without substitution of a new Plaintiff, even after the Magistrate

Judge's Recommendation.  The Magistrate Judge concluded that the Plaintiff's standing

extended only as far as the § 14(a) claim predicated on the 2004 and 2005 Proxy Statements, and

---

[7]It appears that, rather than address the standing deficit in a constructive manner, the
Plaintiff has gambled on the Court accepting his argument that his own standing was entirely
sufficient.

that he lacked standing to pursue any other claims.  The Magistrate Judge recommended that the Plaintiff  be given the opportunity to find a more appropriate replacement.  But it appears that the Plaintiff disregarded this suggestion.  Three weeks after the Recommendation was issued, the Plaintiff simply filed the Second Amended Complaint, without addressing the standing issue.

As they had done before, the Defendants responded with a challenge to the Plaintiff's standing to bring anything other than the § 14(a) claim based on the Proxy Statements, and as he had done before, the Plaintiff acknowledged the possibility that the Court could dismiss the bulk of his claims for lack of standing, but apparently continued to fail to take any apparent action to substitute another shareholder to prevent such an outcome.

Simply put, the Court finds that the Plaintiff has known for nearly two years that his standing to bring most of the claims herein is doubtful, and has further known that he could easily remedy that problem simply by recruiting a better-qualified replacement.  For whatever reasons, he has allowed nearly two years to pass without doing so, and thus, any request that the Court now grant a further delay of this already aged case to allow him to explore the possibility of a substitution of parties is a request that comes far too late.

Accordingly, the Court finds that the Plaintiff lacks standing to pursue any claims other than the § 14(a) claims premised on the 2004 and 2005 Proxy Statements, and thus, those claims are dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing.  The Court will confine the remainder of its analysis to the remaining claim under § 14(a).

### C.  Sufficiency of the § 14(a) claim

The Court next turns to the question of whether the Plaintiff adequately pleads a § 14(a) claim against each of the Defendants.[8]

Liability under § 14(a) occurs when a corporate officer "solicit[s] any proxy" in violation of SEC regulations. 15 U.S.C. § 78n(a); *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F.Supp.2d 1141, 1150-51 (D. Kan. 2001).  SEC Rule 14a-9, in turn, provides that proxy statements may not contain false or misleading representations or omissions of material fact.  *Id.*, citing 17 C.F.R. § 240.14a-9.  In order to impose § 14(a) liability, then, the Plaintiff must sufficiently plead that each Defendant: (i) misrepresented or omitted a material fact in the 2004 or 2005 Proxy Statement; (ii) that they did so at least negligently; and (iii) the misrepresentation or omission was "an essential link in causing the corporate actions."  *In re Browning-Ferris Indust., Inc.*, 830 F.Supp. 361, 365 (S.D. Tx. 1993).

According to the Second Amended Complaint, the 2004 Proxy Statement at issue in this case requested shareholder votes on two items: election of the Board of Directors (including some candidates who had received backdated options), and approval of Delta's 2004 Incentive Plan.  *Docket* # 115, ¶ 127.  This Proxy Statement was signed only by Defendant Larson, and ostensibly issued "by Order of the Board of Directors," which included Defendants Larson, Parker, Eckelberger, James B. Wallace, Lewis, Keller, Smith, and Stanley. With regard to the

---

[8]Arguably, the next logical question to examine is whether the Plaintiff has adequately alleged a condition precedent to suit – that a demand on the Board that the corporation pursue the § 14(a) claim in its own name was futile.  However, the question of demand futility is closely bound up with questions as to how the claim is pled, such that the Court deems it more appropriate to address the claim itself before turning to the futility of demand on the Board.  As discussed below, the Court ultimately need not reach the demand futility issue.

Incentive Plan, the Proxy Statement stated that the plan required that "the exercise price for nonqualified stock options granted may not be less than the fair market value per share of Common Stock on the day of the grant." It emphasized the Plan's "objective of linking executive compensation to corporate performance." The Proxy Statement also contained a "Report of the Audit Committee" that, among other things, stated that the Audit Committee had "recommended to the Board of Directors that the audited financial statements be included in Delta's [2004] Annual Report . . . for filing with the SEC." Finally, the Proxy Statement recommended shareholder votes for each of the nominated Directors.

The 2005 Proxy Statement was signed only by Defendant Parker, and issued "by Order of the Board of Directors," which included Defendants Larson, Parker, Eckelberger, James B. Wallace, Collins, Lewis, Keller, Smith, Stanley, and Van Blarcom.[9] The 2005 Proxy Statement concerned itself only with requesting shareholder election of Directors; no new Incentive Plan was proposed for shareholder approval. Thus, the Proxy Statement contained only a Report of the Compensation Plan Committee that noted, for example, that the "goal" of the Compensation Committee was to "ensure that the Company retains qualified, experienced executives whose financial interests are aligned with those of the shareholders." The Proxy Statement also contained a Report of the Audit Committee, similar to that discussed above – *i.e.* it recommended that the Board include the audited financial statements in Delta's SEC filings. With regard to the nominees for Director positions, some of whom were involved in the

---

[9]Defendants Nanke, Enright, and John R. Wallace are not alleged to have been responsible for either of the challenged Proxy Statements. Because they are not alleged to have engaged in any conduct sufficient to constitute a § 14(a) violation, the § 14(a) claim against Defendants Nanke, Enright, and John R. Wallace is dismissed.

backdating scheme, the Proxy Statement indicated that the Board "recommends a vote for these nominees."

1. <u>Materiality</u>

Turning first to the question of whether either Proxy Statement contains a "material misrepresentation or omission," the Court first examines whether either of the Proxy Statements listed above contains an affirmative misrepresentation.

The Court cannot discern any false representations of fact in the materials discussed above. For example, the 2004 Proxy Statement recites that the proposed 2004 Incentive Plan requires that options be priced at market prices. The Plaintiff does not assert that this is a false representation of what the Incentive Plan actually provided; rather, his contention is that the Compensation Committee disregarded the Plan's requirements when pricing options.[10] Similarly, there appears to be no dispute that the ostensible purpose of the Incentive Plans was indeed to link executive pay to company performance (although that goal was apparently subverted by Plan administrators who evaded the Plan's terms); that the Audit Committee had indeed recommended that the financial statements be submitted to the SEC (although those financial statements were inaccurate); or that the Board of Directors did indeed recommend that the nominees be elected. Thus, the Second Amended Complaint does not plead any facts that would suggest that either the 2004 or 2005 Proxy Statements contained any affirmative misstatements of fact.

---

[10]The Plaintiff's suggestion that references to the contents of the 2004 Incentive Plan are misrepresentations is further hobbled by the fact that the Plaintiff does not clearly allege that any option issued pursuant to that Plan was indeed backdated.

14

The Plaintiff's theory, then, sounds more in the nature of omission – that is, that the Proxy Statements should have revealed that some Directors had abused the Incentive Plan in the past, granting or receiving backdated stock options.   The Court assumes that the Plaintiff contends the omission of this information was relevant to each of the major categories of information discussed above – that it was germane to the request that the stockholders approve the 2004 Incentive Plan (*i.e.* that stockholders should know that similar plans had been abused in the past, notwithstanding their terms); to the report of the Audit Committee (*i.e.* that stockholders should know that the audited financial statements being submitted to the SEC were misleading with regard to executive compensation); and to the election of Directors (*i.e.* that stockholders would be less likely to vote new terms for Directors who had abused the stock option plan in the past).   Having thus concluded that the Plaintiff's § 14(a) claims involve only omissions of the fact  from the 2004 and 2005 Proxy Statement, the Court next proceeds to examine whether such omissions were "material."

An omission is "material" when "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  By definition, an omission can be material to a shareholder under § 14(a) only when it relates to an issue that is up for a shareholder vote.  Here, stockholders were not asked to vote in any way with regard to the Audit Committee's report or the financial statements being submitted to the SEC, and thus, any omission that related to that issue would be immaterial.  The Court thus considers only whether a reasonable investor might consider knowledge of past acts of backdated options when deciding how to vote on the 2004 Incentive Plan and on the slate of nominees in the 2004 and 2005 Director elections.  It does not

15

strain credulity to believe that an investor deciding whether to approve an Incentive Plan would likely consider it important to know that the company's Directors had previously disregarded and abused a similar Incentive Plan.  Nor can the Court say that a reasonable shareholder would consider such conduct by a Director unimportant when considering whether to re-elect that Director to another term.  Thus, the Court finds that the omission charged by the Plaintiff would be a material one.  *See e.g. In re Zoran Corp. Derivative Litigation*, 511 F.Supp.2d 986, 1015 (N.D. Ca. 2007).

The Defendants' primary challenge to materiality takes a different form: they contend that the fact that Directors had previously backdated options would not be material because that allegation is unsupported by any meaningful proof.  *Citing meVC Draper Fisher Jurvetson Fund I, Inc. v. Millenium Partners, LP*, 650 F.Supp.2d 616, 634 (S.D.N.Y. 2003) ("Rule14a-9 does not impose a duty to disclose unsupported allegations of illegality").  In many ways, this argument is premature.  At the pleading stage of the litigation, the Plaintiff is not required to actually prove his accusation of backdating in order to state a claim under § 14(a).  Such a rule would defeat the purpose of notice pleading.  Rather, it is sufficient for the Plaintiff to plead facts that would indicate that his accusation of backdating is at least plausible and not wholly speculative.

The Defendants focus their argument on the assertion that the Plaintiff has derived his belief that some Directors backdated options solely by applying the Merrill Lynch methodology, and that such methodology offers nothing more probative than statistical correlation.  This same argument has been raised repeatedly in recent securities cases.

The seminal decision addressing the issue is *Ryan v. Gifford*, 918 A.2d 341 (Del.Ch. 2007).  There, considering the question of demand futility on a motion to dismiss, the court

16

examined whether the Merrill Lynch methodology offered sufficient evidence to indicate that the certain directors involved in an alleged backdating scheme could not be considered independent. Observing that the Merrill Lynch analysis suggested that 9 option grants to the corporate directors returned an average annualized profit of 243%, compared to a 29% annualized profit for ordinary investors, the court considered that data "too fortuitous to be mere coincidence." 918 A.2d at 354-55. Rejecting the defendants' argument that the methodology offers "nothing more than statistical abstractions," the court explained that it was "required to draw reasonable inferences and need not be blind to probability." *Id.* n. 34. Characterizing the data as offering either the possibility of backdating or the alternative that the Directors' "timing was extraordinarily lucky," the court stated that when faced with allegations suggesting either "improbable good fortune and knowing manipulation of option grants," it may "reasonably infer the latter." *Id.* Numerous courts since have read *Ryan* to stand for the proposition that diligent application of the Merrill Lynch methodology yields results sufficient to permit an inference – at least for pleading purposes – that backdating is indeed occurring. *See e.g. Alaska Elec. Pension Fund v. Olofson*, 2009 WL 1580296 (D. Kan. June 3, 2009) (unpublished); *Plymouth County Retirement Assn. v. Schroeder,* 576 F.Supp.2d 360, 370-71 (E.D.N.Y. 2008); *In re Maxim Integrated Products, Inc.,* 574 F.Supp.2d 1046, 1060 (N.D. Ca. 2008).

The Defendants attempt to distinguish *Ryan* and its progeny on several grounds. First, the Defendants contend that *Ryan* is applicable only in situations where it is alleged that every option granted by the company is backdated, as was apparently the assertion in *Ryan*. *See e.g. In re Openwave Sys., Inc.*, 503 F.Supp.2d 1341, 1348 (N.D. Call. 2008). In *Openwave*, the court found the plaintiff's analysis of 12 allegedly backdated grants out of 40 to be insufficient for

various reasons.  *Id.* at 1349-51.  Among other things, that court concluded many of the challenged options occurred at strike prices that were not necessarily inconsistent with ordinary statistical variation.  Perhaps as a result, *Openwave* had little criticism of the Merrill Lynch methodology itself, noting only that the *Openwave* plaintiff had failed to apply the methodology as scrupulously as the plaintiff in *Ryan*.  *Id.* at 1351.  In any event, the Defendants' contention that *Ryan* is applicable only where all of the company's options are allegedly backdated is without merit.  *Alaska Elec. Pension Fund*, cited above, is but one example of a court crediting the Merrill Lynch formula where only approximately a third of the company's option grants show statistical disparities.  2009 WL 1580296 at * 6.  Here, the Defendants contend that the Plaintiff challenges anywhere from 8 to 14 particular grants out of an alleged 23, a fraction at least as significant as that in *Alaska Elec. Pension Fund*.[11]

Next, the Defendants contend that "virtually every backdating case utilizing a Merrill Lynch analysis included factual allegations beyond statistics."  The Defendants cite to several cases in which invocation of the Merrill Lynch methodology was coupled with admissions (of varying degrees of specificity) by the company that its grants had been backdated.  While something like a corporate admission of backdating might serve as powerful corroborating

_____

[11]It is not completely clear to this Court how many option grants are involved here.  In the Defendants' motion, it is alleged that the Plaintiff challenges 14 of 23 grants.  In the Defendants' reply brief, that number is reduced to 9 out of 23 grants.  As discussed above, the Court's own analysis of the Second Amended Complaint finds 8 challenged grants, although several of those involved grants on the same day to multiple individuals.  Regardless of whether the figure is 8/23, 9/23, or 14/23, this Court finds that the Plaintiff challenges a sufficiently large fraction of the total number of grants to alleviate concerns that, as in *Openwave*, he has selectively cherry-picked only the small fraction of total grants that occupy normal statistical extremes.

evidence of the inference supplied by the Merrill Lynch methodology,[12] courts have found that it is by no means required to survive a Rule 12(b)(6) motion.  For example, in *Plymouth County*, the court found an accusation of backdating sufficient to survive a Rule 12(b)(6) motion where the plaintiff supplied "the dates of the specific disputed grants, the stock price on those dates, graphically compared to the price on days before and after the grants; a twenty day return accruing to the option grantees, annualized and compared to the annualized return to investors [*i.e.* applied the Merrill Lynch methodology]; the specific language of what the parameters for granting stock options were pursuant to the Company's Stock Option Plans; and the specific allegedly misleading statements and disclosures regarding the options grants."  576 F.Supp.2d at 370.  In doing so, it specifically rejected the defendant's argument that the plaintiff was required to "support its allegations with admissions or statements by [corporate] employees or other witnesses, contemporaneous documents, or restated historical financial statements."[13]  *Id.*

The Plaintiff here supplies precisely the data found to be sufficient in *Plymouth County*, this Court therefore rejects the Defendants' argument that the Plaintiff's primary reliance on the Merrill Lynch methodology somehow prevents its from establishing the materiality of its accusations of backdating.  In any event, the Court is confident that, to the extent corroboration

---

[12]Indeed, where there is a corporate admission of backdating, it would seem that the Merrill Lynch methodology is rendered entirely superfluous.

[13]In reply, the Defendants attempt to distinguish *Plymouth County* by pointing out that it involved a challenge to all or nearly all of the company's stock grants.  While true, this argument bears little on the question of what weight should be given the Merrill Lynch methodology.  At best, the Defendants appear to suggest that the predictive value of the methodology varies according to the proportion of options grants challenged.  Assuming (without necessarily finding) that to be the case, the Court is nevertheless content that the Plaintiff's challenge to somewhat more than 1 out of every 3 options granted by Delta during this time period is sufficient to confer some degree of reliability on the Merrill Lynch methodology in this case.

19

is necessary to amplify the inference created by the Merrill Lynch methodology, the Plaintiff's allegations that the Defendants' options were discretionarily granted and not timely reported to the SEC adds additional support to the inference that the options had been backdated. *See e.g. Zoran*, 511 F.Supp.2d at 1008 (discussing inferences that can be drawn based on the timing of reporting of option grants).

Accordingly, the Court finds that the Plaintiff has adequately alleged that the omissions of reference to the backdating scheme in the 2004 and 2005 Proxy Statements were material.

## 2. Negligence

The Plaintiff is next required to allege that each Defendant was, at the very least, negligent in voting to approve the 2004 and 2005 Proxy Statements.

There is some dispute as to whether the negligence element is subject to the heightened pleading standards of the PSLRA. *Compare City of St. Clair Shores General Employees Retirement System v. Inland Western Retail Real Estate Trust*, 2009 WL 918364 (N.D. Ill. Apr. 1, 2009) (unpublished), *citing Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) (negligence is not a "state of mind," and thus, allegations of negligence are subject to ordinary notice pleading rules, not PSLRA's particularized pleading requirement) *with Zoran*, 511 F.Supp.2d at 1015 (negligence is subject to PSLRA and must be pled with particularity); *see also Lane v. Page*, 581 F.Supp.2d 1094, 1115-16 (D. N.M. 2008) (discussing the issue in light of 10th Circuit precedent, but declining to specifically hold one way or the other). Assuming, without necessarily finding, that the more restrictive PSLRA standard applies, and the Plaintiff must plead particular facts "that give rise to a strong inference of negligence," the Court nevertheless finds that he has done so. *Id.*

In *Zoran*, the court found, on similar facts, that a complaint sufficiently alleged the negligence of the defendant directors by asserting that those directors served on either the firm's Compensation Committee (which approved the granting of the backdated options), or on the firm's Audit Committee (which failed to properly account for the backdated options). 511 F.Supp.2d at 105-16 ("They were charged with ensuring compliance with accounting standards and making certain that Zoran's financial statements and proxy statements were correct and accurate. Even if they did not know backdating was occurring, under these pleaded facts, they have still shirked their duties"). Here, except as noted below, the Plaintiff alleges that each of the Defendants either personally participated in the backdating scheme,[14] or were members of Delta's Compensation or Audit Committees[15] during the period of the backdating scheme. Certainly, a Director who was actually aware of the backdating scheme – having participated in it as a grantor or grantee – can be said to have been negligent in failing to disclose that scheme in the 2004 or 2005 Proxy Statement. Moreover, as in *Zoran*, the Court is content to assume that a Director's service on either the Audit or Compensation Committees – the two groups charged with ensuring that the Incentive Plan is carried out according to its terms – during the time the scheme was in effect is sufficient to allege that the Director should have been aware of the backdating scheme. As a result, the Plaintiff has adequately alleged the negligence of Defendants Larson, Parker, Eckelberger, J.B. Wallace, Lewis, and Keller.

---

[14]Defendants Larson, Parker, Eckelberger, and James B. Wallace allegedly personally participated in granting or receiving backdated options.

[15]Defendant Lewis served on both committees since 2002, while the backdating scheme was occurring. Defendant Keller served on the Audit Committee from 2002-2003, during which time, one of the backdated grants was issued.

However, the Plaintiff has failed to adequately allege the negligence of Defendants Smith, Stanley, and Van Blarcom.  Turning first to Mr. Van Blarcom, he served as a Director of Delta since July 2005, and voted to approve the 2005 Proxy Statement.  However, the Second Amended Complaint does not allege that Mr. Van Blarcom served on either the Compensation Committee or the Audit Committee at any time.  Nor does it allege any particular facts that would demonstrate that Mr. Van Blarcom had any reason to be aware of the backdating scheme.  Perhaps in the abstract, one might fault the Director of a corporation for not being aware of improprieties committed by other corporate Directors, but in the absence of facts that would specifically demonstrate why Mr. Van Blarcom knew or should have known of the backdating scheme, the Court cannot find that Mr. Van Blarcom's negligence has been sufficiently pled.  Accordingly, the § 14(a) claim against Mr. Van Blarcom is dismissed for failure to state a claim.

Defendants Smith and Stanley served on Delta's Audit Committee in 2004 and 2005.  However, the Second Amended Complaint does not allege that any backdated options were granted during their tenure on the Audit Committee, as the last alleged backdated option was granted on December 8, 2003.  Thus, their activities on behalf of the Audit Committee cannot be expected to reveal to them the existence of a backdating scheme that had already concluded before they joined that Committee.   Nothing in the Second Amended Complaint reveals any other circumstances that would suggest that Defendants Smith and Stanley should have known of the backdating scheme, such that their approval of the Proxy Statements can be said to have been done negligently.  Accordingly, the § 14(a) claim against Defendants Smith and Stanley is dismissed as well.

3. <u>Essential link</u>

Finally, the Plaintiff must allege facts that show that the Proxy Statements themselves were an "essential link" in the Defendants accomplishing "the transaction." *Zoran*, 511 F.Supp.2d at 1016. This element essentially examines the issue of causation, inquiring whether the transaction described in the allegedly misleading Proxy Statement was one that, once approved by shareholders, resulted in a loss to the Plaintiff. *See e.g. General Elec. Co v. Cathcart*, 980 F.2d 927, 932-33 (3d Cir. 1992) ("damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought"); *Hulliung v. Bolen*, 548 F.Supp.2d 336, 240 (N.D. Tx. 2008) ("essential link" element is established by showing that stockholders' alleged injury resulted from a transaction directly authorized by the proxy solicitation).

When properly limited to the 2004 and 2005 Proxy Statements, the Plaintiff's § 14(a) claim fails to adequately allege an essential link between the transactions contemplated and the injuries sustained by Delta stockholders. The Second Amended Complaint indicates that the last incident of backdating options being granted was in 2003, and thus, the scheme had concluded before the shareholders were asked to approve the 2004 Incentive Plan, the 2004 slate of Directors, and the 2005 slate of Directors. If the Defendants committed no new acts causing injury to the company after the vote contemplated by the 2004 Proxy Statement, the fact that the Defendants may have misrepresented facts in order to obtain shareholder approval of those corporate transactions caused no new injury to shareholders. One might criticize a company that fraudulently obtains shareholders' proxy votes, but if the corporate actions approved by those

23

fraudulently-obtained votes do not result in harm to the shareholders, there is no liability under § 14(a).   Indeed, on nearly identical facts, the court in *Hulliung* dismissed § 14(a) claims where the options backdating scheme was concluded before the challenged proxy solicitations.   548 F.Supp.2d at 340-42.

The Plaintiff here offers two arguments in support of his contention that an essential link has been pled: (i) that the Court has previously found an essential link to have been adequately alleged in the Plaintiff's prior pleadings, *citing Docket* # 108; and (ii) that the facts of this case follow *Zoran*, in which an essential link was found between the proxy statements at issue and the backdating scheme.

With regard to the first point, the Plaintiff's assertion that "The Court previously determined that" the Plaintiff had properly pled an essential link between the 2004 and 2005 Proxy Statements and his loss overstates the record.   The document cited by the Plaintiff is the Magistrate Judge's September 5, 2008 Recommendation, which this Court specifically declined to adopt.   Thus, this Court has not "previously determined" anything of the sort.   Moreover, although the Recommendation purports to find allegations in the then-proposed Second Amended Complaint sufficient to demonstrate an "essential link" between the transactions anticipated by the Proxy Statements and the harm to the Plaintiff, this Court finds the Magistrate Judge's analysis to be unpersuasive for several reasons.

Perhaps most importantly, unlike this Court, the Magistrate Judge's examination of the "essential link" element was not limited to the 2004 and 2005 Proxy Statements.   *See Docket* # 105 at 11 (although discussing the 2005 Proxy Statement, citing to allegations in the proposed Second Amended Complaint involving proxy statements from 1996 through 2002, among

others).  While the Plaintiff may have adequately pled an essential link between earlier Proxy

Statements and losses to the corporation from a then-ongoing backdating scheme, that analysis is

very different when the scope of the Plaintiff's claim is properly limited to only those proxy

votes that occurred after the backdating scheme was completed.

Moreover, the Magistrate Judge cites five allegations in the Second Amended Complaint

that, she concluded, demonstrated the essential link between the 2004-2005 Proxy Statements

and the Plaintiff's injury.  This Court does not find that any of these allegations are sufficient to

demonstrate that the 2004 and 2005 corporate transactions caused the Plaintiff any injury.

The first three averments cited by the Magistrate Judge simply restate that the Plaintiff's

theory that the Defendants omitted material facts about the backdating scheme from the Proxy

Statements; they do not indicate how the particular corporate transactions approved by

shareholders in 2004 and 2005 injured the Plaintiff.  *Id.* at 12, citing Second Amended

Complaint, ¶ 82-86.  The final two allegations cited by the Magistrate Judge are conclusory

averments by the Plaintiff that the Proxy Statements "were an essential link . .  as revelations of

the truth would have immediately thwarted a continuation of shareholders' endorsement of the

directors' positions, the executive officers' compensation and the Company's compensation

policies."  *Id.*, *citing* ¶ 196, 197.[16]  However, this too fails to plead that the transactions approved

---

[16]In addition to listing the five averments discussed above, the Magistrate Judge quoted, without elaboration, a passage from paragraph 80 of the Second Amended Complaint which alleges that "[k]eeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to Delta that were less than they should have paid."  The Court cannot readily discern how the approval of an unrelated compensation plan and the election of Directors can be said to have somehow postponed the date of injury to Delta under this theory.  Indeed, such an argument ignores the Plaintiff's espoused theory that it was the <u>granting</u> of legal rights conferred by the options, not the subsequent <u>exercise</u> thereof, that injured Delta.

in 2004 and 2005 operated to injure the Plaintiff.  Certainly, the Plaintiff may be correct that, had shareholders known of the Directors' prior malfeasance, the shareholders might not have retained those Directors.  But this is not the equivalent of pleading facts that show that the Plaintiff suffered any particular injury because the Directors <u>were</u> retained, as the Plaintiff does not allege any additional acts of malfeasance occurring after the first retention vote in 2004.

In this regard, *Hulliung* is instructive.  There, as here, the stockholder plaintiff sought to assert a § 14(a)claim based on a proxy statement that encouraged retention of Directors and approval of a new compensation plan, but failed to disclose facts about an options backdating scheme that had previously existed but had been concluded.  Construing the shareholder's argument on the issue of causation to be that "the Proxies misled Michaels shareholders into electing [to retain] directors who [previously] took allegedly improper actions," the court found that insufficient to plead the "essential link"element.  "[I]t is well established," the court explained, "that . . . liability can only be established when the proxy at issue <u>directly authorizes</u> the loss-generating corporate action."  548 F.Supp.2d at 341 (emphasis added), *citing In re Browning-Ferris Indus., Inc. Shareholder Derivative Litig.*, 830 F.Supp. 361, 370 (S.D. Tx. 1993) ("a claim seeking relief for injuries occasioned by mismanagement . . . is not redressible under the proxy rules simply be virtue of the fact that acts were committed by directors who would not have been elected but for the proxy solicitation"); *see also In re Affiliated Computer Services Derivative Litigation*, 540 F.Supp.2d 695, 704 (N.D. Tx. 2007) (doubting whether a §14(a) claim can ever be predicated on a proxy statement that merely urges the re-election of certain Directors).

Both the Magistrate Judge and the Plaintiff here rely on *Zoran*, but that case is factually distinct from this case.  In *Zoran*, the shareholder acquired his stock in the company – and thus, his standing to sue – in 2003.  Although most of the backdated option grants in that case preceded the shareholder's ownership, that court found at least one grant, on November 23, 2005, where the plaintiff had pled sufficient indicia of backdating.  511 F.Supp.2d at 1008.  Although the decision does not specifically describe the contents of proxy statements issued between 2003-2005, it appears that some of these proxy votes involved the retention of Directors who had known of or participated in the backdating scheme and who were involved in the 2005 backdating as well.  *Id.* at 1016.  Thus, when faced with the question of whether the shareholder had adequately pled an essential link between the proxy votes to retain Directors and the injury to the corporation from backdated options, that court, relying primarily on what appeared to be a <u>continuing</u> backdating scheme, found that such a link had been alleged.  *Id.* at 1016 ("with each election, the board could <u>continue</u> to grant backdated options to itself. . . .", "If defendants had not falsely stated . . . that stock options were being granted properly . . . shareholders would have voted those board members out, and the board members would <u>no longer</u> have had the means to grant <u>more</u> backdated stock options") (emphasis added).  Thus, the essential characteristic of *Zoran* – and the one not present here – is the fact that the backdating scheme <u>continued</u> after the Directors were retained as a result of misleading proxies, suggesting that the proxies enabled the Directors to take future action that harmed the company.  No such post-proxy harm is alleged by the Plaintiff here.

Accordingly, the Court finds that the Plaintiff has failed to adequately allege an "essential link" between the corporate transactions embodied by the 2004 and 2005 Proxy Statements and

any injury to Delta.  Without such a link, the § 14(a) claim must be dismissed as against all

remaining Defendants.[17]

      **D.  Demand on board**

      Because the Court dismisses all of the claims in the Second Amended Complaint for the

reasons discussed above, it need not reach arguments as to whether the Plaintiff is relieved of the

obligation to make a demand on the Board of Delta to pursue his claims.

--------------------------------

      [17]With the exception of the suggestion, *supra.*, that a new representative shareholder could be recruited as a plaintiff, the Court does not understand the Plaintiff to request that, if the Court finds the Second Amended Complaint defective in some respect, that the Plaintiff be given another opportunity to replead.  Even if the Court discerned such a request, it would not be inclined to grant it.  Although leave to amend a pleading should be "freely granted," the Court may deny such leave for, among other things, undue delay or the failure of the moving party to correct deficiencies via prior amendments.  *Beerheide v. Zavaras*, 997 F.Supp. 1405, 1409 (D. Colo. 1998), *citing Foman v. Davis*, 371 U.S. 178, 182 (1962).

      Here, the Second Amended Complaint is the third attempt by the Plaintiff to plead claims, and the second occasion on which this Court has been asked to adjudicate a motion to dismiss those claims for pleading deficiencies.  This case is now more than three years old and has yet to advance beyond the pleading stage.  Although the Court appreciates the difficulties attendant to pleading complex securities claims of this type, such difficulties do not entitle a party to endlessly refine claims on  the Defendants' dime and the Court's (and therefore public's) time.   It does not appear that any amendment by this Plaintiff will likely cure the deficiencies noted herein, and therefore the Court declines to grant the Plaintiff further leave to amend.

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion to Dismiss (**# 112**) is **GRANTED**.

The Second Amended Complaint is **DISMISSED** in its entirety.  The Clerk of the Court is

directed to close this case, as well as all of its member cases.

Dated this 23rd day of September, 2009

**BY THE COURT:**

Marcia S. Krieger
United States District Judge